Regina Ann JOHNSON, Plaintiff,

v.

BE & K CONSTRUCTION COMPANY, LLC and Archer Daniels Midland Company, Defendants.

No. 3:08–cv–00150.

United States District Court,
S.D. Iowa,
Davenport Division.

June 22, 2010.

John F. Doak, Katz Huntoon & Fieweger, Moline, IL, Jennifer J. Pomaranski, Timothy A. Wolfe, Meckler Bulger Tilson Marick & Pearson LLP, Chicago, IL, for Archer Daniels Midland Company.

Martha L. Shaff, Betty Neuman & McMahon PLC, Davenport, IA, for BE & K Construction Company, LLC.

Dorothy A. O'Brien, Attorney & Counselor Law, PLC, Davenport, IA, for Plaintiff.

### MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ROBERT W. PRATT, Chief Judge.

Before the Court are a Motion for Summary Judgment filed by Defendant BE & K Construction Company, LLC ("BE & K") and a Motion for Summary Judgment filed by Defendant Archer Daniels Midland Company ("ADM"). Clerk's Nos. 39

(BE & K), 40(ADM). Plaintiff Regina Ann Johnson ("Plaintiff") filed a single resistance to both Motions (Clerk's No. 41) and BE & K and ADM each replied. Clerk's Nos. 45(ADM), 47 (BE & K). The matters are fully submitted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

ADM operates a corn processing plant in Clinton, Iowa (hereinafter "ADM plant"). ADM's Statement of Material Facts (hereinafter "ADM Facts") ¶ 2. As part of the ADM plant, ADM maintains a warehouse that provides parts for machinery and equipment used elsewhere in the ADM plant. *Id.* ADM contracts with BE & K to provide workers for a variety of functions at the plant, including front counter staff for ADM's warehouse. *Id.* ¶ 3. BE & K personnel work in positions throughout ADM's plant. *Id.* ¶ 4.

Plaintiff, an African–American female, began working for BE & K in February 2006. *Id.* ¶ 6; BE & K's Statement of Facts (hereinafter "BE & K Facts") ¶ 1. Initially, BE & K assigned Plaintiff to a labor crew at the ADM plant doing clean-up work. ADM Facts ¶ 7; BE & K Facts ¶ 3. In April 2006, however, BE & K offered Plaintiff a job working in the warehouse as a counter attendant. ADM Facts ¶ 8. Plaintiff's job duties as a warehouse counter attendant included taking orders over the phone, waiting on vendors, putting away stock, sweeping the floor, breaking down boxes, and performing inventory. BE & K Facts ¶ 5.

While Plaintiff was employed as a BE & K worker at the ADM plant, she had several complaints against her and received several verbal or written reprimands. On May 1, 2007, BE & K issued Plaintiff a written reprimand for "Unsatisfactory Attendance (Includes Late Arrivals/Early Quits)." ADM App. at 61.[1] On October 30, 2007, BE & K issued Plaintiff a written reprimand for "Substandard Job Performance" on the basis that Plaintiff "was involved in argument w/ co-worker while on the job in front of other employees of BE & K and of client, ADM-raised voice." *Id.* at 62. The co-worker, Tiffany Tracy ("Tracy"), a Caucasian BE & K employee, also received a written reprimand for the incident.[2] ADM Facts ¶ 16. Plaintiff was also verbally reprimanded at some point in time for painting her fingernails while on duty at the warehouse counter. BE & K Facts ¶ 10.

---

**1.** The May 1, 2007 reprimand was apparently in relation to Plaintiff taking time off during her shift to go to appointments without using approved vacation days. ADM Facts ¶ 14. Plaintiff contends that she was told by Maggie McNitt, BE & K's office manager, to go to her appointments and then make up the time when she returned to work, rather than using vacation leave. ADM App. at 12. At some point, however, BE & K's attendance policy changed, and McNitt apparently felt she had no choice but to discipline Plaintiff pursuant to the policy. *See* Pl.'s Resp. to ADM Facts ¶ 14 ("Admit Ms. Johnson received a written warning relating to time taken for medical appointments. She had been doing so under an agreement made at the suggestion of Maggie McNitt. McNitt had told Ms. Johnson there was no need to use vacation time for these appointments.... The warning was given for incident made because of that agreement but that occurred before the [new attendance] policy went into effect.").

**2.** Plaintiff states that the argument with Tracy was because Tracy "arbitrarily shortened Ms. Johnson's lunchtime and then complained when Ms. Johnson later took a break in order to get something to eat" at the same time as another employee, Jerry Stoddard. Pl.'s Resp. to ADM Facts ¶ 15. Plaintiff claims that she returned to her job, but that Tracy remained in the break room with Mr. Stoddard drinking pop. *Id.* "When Ms. Johnson confronted Ms. Tracy about doing the exact thing she had criticized Ms. Johnson for Ms. Tracy began to yell at Plaintiff, telling her to leave her the fuck alone." *Id.*

In addition, over the course of her employment at the ADM plant, multiple complaints were made about Plaintiff's personal phone usage. *Id.* ¶ 12. Plaintiff admits that she gave out BE & K's telephone number as her work number, and that the BE & K office received multiple phone calls for Plaintiff from creditors and from Plaintiff's family members.[3] ADM Facts ¶¶ 20–21. In approximately May 2007, Maggie McNitt ("McNitt"), BE & K's office manager, warned Plaintiff that it was inappropriate for her to give out BE & K's office number for personal reasons.[4] *Id.* ¶ 22; BE & K Facts ¶ 14. ADM's warehouse interim lead person until February 2008, Pete Byers ("Byers"), also reported that he observed excessive phone usage by Plaintiff and by Tracy. ADM Facts ¶ 17. Byers specifically noted that Plaintiff frequently took personal calls, both while on break and while on duty, and that her breaks were often too frequent or too long. BE & K Facts ¶¶ 17, 19. Byers talked to both women about their phone usage and testified that he saw improvement from Tracy, but no improvement from Plaintiff. *Id.* ¶¶ 18–19; ADM App. at 124.

In January 2008, William Tanner ("Tanner"), an ADM employee, took over as warehouse supervisor. BE & K Facts ¶ 21. Tanner hired a new lead person, Brandi King ("King"), to replace Byers, but prior to leaving, Byers had expressed some concerns to Tanner about excessive phone usage by Plaintiff and Tracy. ADM App. at 84. When Tanner first started as warehouse supervisor, he began observing warehouse staff, starting with the front warehouse counter where Plaintiff worked.

*Id.* During his observations, Tanner noticed for himself that Plaintiff and Tracy had "a problem, as far as phone usage during busy, busy times." [5] *Id.* At some point, Tanner expressed concern to McNitt about Plaintiff's "phone usage and also with being able to find [her] during work times." *Id.* at 92. Tanner also told McNitt that he was concerned about ongoing problems between Tracy and Plaintiff. *Id.* at 93. In response, it was determined that BE & K supervisor Tom Zuidema ("Zuidema") would begin assisting at the warehouse with supervisory duties in early February 2008. ADM Facts ¶ 45; ADM App. at 93. When Zuidema began working at the ADM plant, Tanner "told him my concerns, as far as those people [Tracy and Plaintiff] not getting along, the break times, and also the fact that—just overall performance." ADM App. at 93. Tanner saw some improvement in the front counter situation at first, but in mid-February 2008, he had another conversation with Zuidema about "what's going on with excessive phone usage, still [Plaintiff's] excessive phone usage, and the fact that they [Plaintiff and Tracy] were still arguing." *Id.* Tanner did not, however, see any further improvement. *Id.*

On February 19, 2008, Tanner had a meeting with warehouse staff, including Plaintiff and Tracy, about excessive use of the phone. BE & K Facts ¶ 22. During the meeting, Plaintiff and her team members were informed that they were only to conduct "personal business on break times" and that emergency phone calls were to be kept to a minimum and were not to be disruptive to the warehouse or its

---

3. The BE & K office referenced was located on-site at the ADM plant.

4. Plaintiff contends that she ceased giving out her work phone number to anyone after the conversation with McNitt. Pl.'s Resp. to ADM Facts ¶ 22.

5. Tanner testified: "When I started to work the front counter, [I] noticed the fact that when I would come up to the counter and start to walk up there, [Plaintiff] would be on the phone; and as I would approach the counter, she would get off the phone and walk away." ADM App. at 86.

employees.[6] *Id.* ¶ 23. After the meeting, Plaintiff went to Tanner privately and admitted that she had been receiving multiple personal phone calls from her pregnant teenage daughter. *Id.* ¶ 24; BE & K App. at 29. According to Tanner, "when [Plaintiff] explained that to me, I said, okay, but just please try and keep this at a minimum, so it doesn't impact your ability to be able to work in the warehouse and to efficiently take care of the customers." ADM App. at 85–86. Plaintiff contends that, after her conversation with Tanner, she instructed her daughter not to call her at work unless it was an emergency. Pl.'s Resp. to ADM Facts ¶ 36. Tanner, however, states that Plaintiff's personal phone usage did not improve. ADM App. at 86.

On Monday, February 25, 2008, Plaintiff began having trouble with her hot water heater at home and asked the ADM lead person, King, if she could use the phone regarding that situation. BE & K Facts ¶ 27. King testified that she told Plaintiff it would be fine to use the telephone, but "to keep her phone usage during break time" and to keep the calls to a minimum.[7] BE & K App. at 47. Over the next two days, Plaintiff made and received approximately eight phone calls dealing with the water heater issue. BE & K Facts ¶¶ 28–29; ADM Facts ¶ 54.

On Friday, February 29, 2008, Zuidema met with Plaintiff to discuss his concerns about her employment. BE & K Facts ¶ 30. Zuidema issued Plaintiff a written reprimand on the same date, at McNitt's request, for "Substandard Job Perform-

ance," specifically "talking on phone when she should be working counter. This puts extra burden on co-workers, keeps machinery down longer for employees waiting for parts costing company money." BE & K App. at 50; *see* ADM App. at 128 (Zuidema testifying that McNitt told him to write up the reprimand because Plaintiff "was on the phone a lot and [McNitt] was getting four to six phone calls in her office a day for [Plaintiff]. And so she instructed me to write this up, just give Regina a warning that we needed to stop that."). The reprimand is marked as a "warning" and under "Potential Consequence(s)" reads: "This will lead up to termination." BE & K App. at 50.

Though Zuidema never stated or implied that the phone calls at issue were those Plaintiff made in relation to her hot water heater, Plaintiff assumed that she was being reprimanded for those calls. BE & K Facts ¶ 32. Plaintiff told Zuidema that King had given her permission to use the phone, and the two walked over to talk to King. ADM App. at 49. Plaintiff recounts the incident as follows:

> I talked to—I talked to Tom Zuidema, because he was nice about it. He came over. And he said, Regina, Bill Tanner must have went to Maggie, and told Maggie something about you using the phone or something. And I said—I told Tom—I said, Tom I had permission to use the phone. I said, come and ask Brandi [King]. I said, she will tell you. So we walked back there where Brandi was. I said, did you give me permission

---

6. The Court has not been presented with any written BE & K telephone policy. Nonetheless, according to BE & K, its company policy in relation to receiving or placing personal phone calls while on duty was "emergency phone calls only." BE & K Facts ¶ 6. If employees were asked to work extra hours without advance notice, however, they were permitted to use the company phone to make arrangements for the extra hours. *Id.* Addi-

tionally, BE & K states that its policy "also provided that while working in the warehouse, employees could use the telephone for personal reasons only during their break time." *Id.* ¶ 7.

7. Plaintiff denies that King "limited the permission to break time." Pl.'s Resp. to BE & K Facts ¶ 27.

to use the phone and make a phone call for my hot water tank. And she said, yes, I did. I said, Bill Tanner done wrote me up for it. She asked to look at it. She said, I don't know why he would do that. I said, I don't know either, but that ain't even right. But I says, but that's okay. I'll go ahead and sign it.

And Tom said, well, go ahead and put on there, you know, whatever you just said, that you had permission, and just sign it.[8] And he said, just don't use the phone, unless it's a life or death situation again, you know, he said. And I said, no, I'm not going to even use it for that. I'm not going to use the phone for anything.

*Id.* at 22. Zuidema testified that Plaintiff was mad and "got a little loud" when he presented her with the reprimand, but that he could not say she was disrespectful to him. *Id.* at 129. King testified that while Zuidema was talking to Plaintiff in the room next to her office (before coming to King's office), Plaintiff used a "raised voice" that was "pretty loud," and "louder than normal conversation." *Id.* at 106, 110. King stated that she did not believe that Plaintiff's tone of voice was appropriate for the workplace. *Id.* at 110–11. King further testified that, as the meeting concluded, Plaintiff "said that she wasn't going to put up with the racial stuff. She was going to take it outside of here." *Id.* at 105–06.

Plaintiff was upset after the meeting and asked for permission to go home. *Id.* at 23. Zuidema told Plaintiff to make sure McNitt knew she was leaving, which Plaintiff did. *Id.* As Plaintiff was preparing to leave the plant, Tanner walked in, and Plaintiff informed him she was going home. *Id.;* BE & K Facts ¶ 34. Tanner was then informed by King that "[Zuidema] had come in to give [Plaintiff] a written reprimand, and that she had gotten very loud, and kind of—she had gotten real loud, and then said she wasn't—she was going to leave. And she ended up leaving." *Id.* at 94. Tanner testified that it was his understanding that there had been a "big scene in the warehouse" wherein Plaintiff "was yelling at [Zuidema]." *Id.* Tanner decided that this was the last straw, and he then went to BE & K to discuss having Plaintiff removed from the warehouse. *Id.* After receiving permission from his own boss, Andy Hardigan, Tanner talked to Dave Sczney[9] ("Sczney") and McNitt and told them that he did not want Plaintiff in his department anymore because of her "excessive phone usage," "being argumentative with ADM management,"[10] and "not being able to get along with her colleagues." *Id.*

Plaintiff worked for a few hours on the following day (Saturday) and then reported for work as normal on Monday, March 3, 2008. ADM App. at 23–24 Tanner met her at the door and told Plaintiff to go talk to McNitt. *Id.* at 24. Plaintiff went to talk to McNitt, and McNitt, along with Sczney and Sheila Geltz,[11] informed Plain-

---

8. Under "Employee Statement," Plaintiff did, in fact, write: "I ask Brandi if it was o.k. to use the phone for emergency as which my hot water heater had broken and she said it was o.k. to receive phone call and she also gave me a phone # to call to get help with the payment." BE & K App. at 50.

9. Sczney was BE & K's project superintendent. ADM Facts ¶ 9.

10. With regard to being "argumentative with management," Tanner referenced Plaintiff

"yelling" at Zuidema. ADM App. at 94. Tanner also noted that when Byers would ask Plaintiff to help, Plaintiff "was not willing to do that. She wouldn't get off the phone. And then when [Byers] was asking her to do stuff, a lot of times she would just walk away from him." *Id.* at 95.

11. The Court could not find additional references to Sheila Geltz in the record and is uncertain what position she held. Given that the only reference to Geltz indicates that she was merely present at the time of Plaintiff's

tiff that she had been terminated. *Id.* No reasons for her termination were discussed, and Plaintiff did not follow up with anyone from BE & K or ADM about the reason for her termination. BE & K Facts ¶¶ 38–39. Plaintiff admits that Tanner only requested that BE & K remove Plaintiff from the warehouse, not that her employment be terminated. ADM Facts ¶ 85. Plaintiff further admits that BE & K made the ultimate decision to terminate her employment after Tanner's request to have her removed from the warehouse, and that BE & K did not consult with ADM in making its termination decision. *Id.* ¶¶ 81–84.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.; see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is not " 'to cut litigants off from their right of trial by jury if they really have issues to

try,' " *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Board of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence nor make credibility determinations, rather it only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.").

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving

termination, however, her position does not appear relevant.

party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

■ As employment actions are inherently fact based, the Eighth Circuit has repeatedly cautioned that summary judgment in such cases should "seldom be granted ... unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.,* 145 F.3d 986, 990 (8th Cir. 1998) (citations omitted); *see also Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) ("[S]ummary judgment should seldom be used in employment discrimination cases.") (citing *Johnson v. Minn. Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991)); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987) ("Summary judgments should seldom be used in cases alleging employment discrimination ...."), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). This is because "inferences are often the basis of the claim ... and 'summary judgment should not be granted unless the evidence could not support any

reasonable inference' of discrimination." *Breeding v. Gallagher & Co.,* 164 F.3d 1151, 1156 (8th Cir.1999) (quoting *Lynn v. Deaconess Med. Ctr.-W. Campus,* 160 F.3d 484, 486–87 (8th Cir.1998)). Therefore, the Court must be "particularly deferential to the nonmovant." *E.E.O.C. v. Woodbridge Corp.,* 263 F.3d 812, 814 (8th Cir. 2001).

■ However, this does not mean that summary judgment is never appropriate in the employment discrimination context. The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. "[T]here is no 'discrimination case exception' to the application of Fed.R.Civ.P. 56, and [summary judgment] remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial." *Rodgers v. U.S. Bank, N.A.,* 417 F.3d 845, 850 (8th Cir.2005) (citing *Berg v. Norand Corp.,* 169 F.3d 1140, 1144 (8th Cir.1999)). The Eighth Circuit has specifically stated that even in discrimination cases "summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case." *E.E.O.C.,* 263 F.3d at 814; *see also Bialas v. Greyhound Lines, Inc.,* 59 F.3d 759, 762 (8th Cir.1995) ("[I]f the plaintiff fails to establish a factual dispute on each element of the prima facie case, summary judgment is appropriate.") (citation omitted).

### III. LAW AND ANALYSIS

#### A. *Plaintiff's Claims Against BE & K*

■ Plaintiff alleges that BE & K illegally discriminated against her and termi-

nated her on the basis of her race, in violation of 42 U.S.C. § 1981. Section 1981, in relevant part, provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.... For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(a) & (b). "[I]t is well settled ... that § 1981 affords a federal remedy against discrimination in private employment on the basis of race." *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 314, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) (stating that § 1981 "was widely understood to apply to the discriminatory enforcement and termination of employment contracts").

■ Plaintiff also brings a state claim under the Iowa Civil Rights Act ("ICRA"). *See* Iowa Code Chapter 216. Federal case law supplies the basic framework for deciding ICRA cases. *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1380 (8th Cir.1996). Neither BE & K nor Plaintiff makes any separate legal arguments regarding Plaintiff's ICRA claims. The Court, therefore, will address both the federal and state discrimination claims together.

1. McDonnell Douglas *burden-shifting framework.*

■ A plaintiff may establish unlawful discrimination through either direct or indirect evidence. *Takele v. Mayo Clinic*, 576 F.3d 834, 837 (8th Cir.2009). Plaintiff does not allege direct evidence of race discrimination in this matter. *See Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir.1991) ("[D]irect evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude ... [c]omments which demonstrate a 'discriminatory animus in the decisional process' ... or those uttered by individuals closely involved in employment decisions may constitute direct evidence." (citations omitted)). Lacking any direct evidence of racial animus as a motivating factor for either her removal request by ADM or her later termination by BE & K, Plaintiff offers indirect and circumstantial evidence meant to create an inference of racial animus by both Defendants.[12] Pl.'s Resistance Br. at 6–7.

This evidence must be analyzed through a progressive three-step process in which the burden of production begins with the plaintiff, shifts to the defendant, and then shifts back to the plaintiff who bears the ultimate burden of persuasion throughout. This "burden-shifting" analytical framework was established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089,

---

**12.** While the Court is technically dealing with BE & K's Motion for Summary Judgment at this time, the nature of Plaintiff's theory of BE & K's liability necessarily requires the Court to undertake significant discussion of matters pertaining to ADM. Thus, where BE & K's Motion for Summary Judgment overlaps with ADM's Motion for Summary Judgment, the Court will discuss the matters together.

67 L.Ed.2d 207 (1981). *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Dammen v. UniMed Med. Ctr.*, 236 F.3d 978, 980 (8th Cir.2001). Although *McDonnell Douglas* was based on a Title VII action, its three-stage analysis has been extended to include all civil rights claims, including those under § 1981. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186–87, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (applying the *McDonnell Douglas* framework to actions under § 1981); *Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1196 (8th Cir.2006).

■ Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that she ... was rejected under circumstances which give rise to an inference of unlawful discrimination. The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. *See Teamsters v. United States*, 431 U.S. 324, 358, and n. 44, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). As the Court explained in *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of

the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

*Burdine*, 450 U.S. at 253–54, 101 S.Ct. 1089. If a plaintiff satisfies her prima facie burden, a presumption of discrimination is created, and the intermediate burden of production shifts to the defendant, who must then articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 253, 101 S.Ct. 1089. If the defendant carries this burden, the presumption of discrimination is neutralized, and the burden shifts back to the plaintiff who must then show that the employer's proffered reason was merely a pretext for discrimination. *Id.* "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

2. *Prima facie case.*

■ To establish a prima facie case of racial discrimination, Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for her position or was meeting the legitimate expectations of her employer; (3) she was discharged or suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably such that the discharge occurred under circumstances giving rise to an inference of discrimination. *See Rodgers*, 417 F.3d at 850; *Schoffstall v. Henderson*, 223 F.3d 818, 825 (8th Cir. 2000); *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir.2000); *Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000).

■ BE & K does not dispute that Plaintiff is a member of protected group, that she was qualified for her position, or that she suffered an adverse employment action. BE & K Br. at 8. Rather, BE & K

contends that Plaintiff cannot establish a prima facie case of discrimination because she has not demonstrated that her discharge occurred under circumstances giving rise to an inference of discrimination. *Id.* Plaintiff contends that she has put forth ample facts to support an inference of discrimination sufficient to support the fourth element of the prima facie case. Pl.'s Resistance Br. at 4.

Plaintiff can establish the fourth element of her prima facie case in a variety of ways, including "by putting forth facts that similarly situated employees, who are not African–American, were treated differently," *Rodgers,* 417 F.3d at 850–51 (citing *Wheeler v. Aventis Pharms.,* 360 F.3d 853, 857 (8th Cir.2004)), or by demonstrating that she was replaced by someone who is not a member of Plaintiff's protected class. *See Davenport v. Riverview Gardens Sch. Dist.,* 30 F.3d 940, 944–45 (8th Cir.1994) (noting that "proof of replacement by a person outside the protected class will satisfy the fourth element"). Though the parties do not extensively discuss the matter, Plaintiff has asserted that she was "replaced by a white female, Daffney DeVries." Pl.'s Resistance Br. at 4. This assertion is supported by Tanner's testimony and is sufficient, at the prima facie stage, to permit an inference of discrimination. *See* ADM App. at 87 ("Q. "Did someone replace Regina Johnson in the warehouse? A. Yes. Q. And was that Daffney DeVries? A. Yes, it was. Q. And her race is what, white, correct? A. Yes.").

3. *Legitimate non-discriminatory reason.*

Because Plaintiff has shown a prima facie case of discrimination, the burden now shifts to BE & K to show that it had a legitimate, nondiscriminatory reason for terminating Plaintiff's employment. The Supreme Court has described a defendant's burden of production at this second stage of the *McDonnell Douglas* analysis as follows:

The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. *See* [*Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) ]. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Burdine,* 450 U.S. at 254–256, 101 S.Ct. 1089. "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs.,* 188 F.3d 932, 936 (8th Cir.1999).

BE & K contends that it terminated Plaintiff "because there were no available positions after ADM requested she be removed from the warehouse." BE & K Br. at 11; *see also* BE & K App. at 59 (termination form stating that reason for termination is "client request removed from position, no other position available"). BE & K, through its counsel, also stated in a letter to the Iowa Civil Rights Commission ("ICRC"), dated June 30, 2008, that "BE & K terminated [Plaintiff's employment] for legitimate performance issues," noting her three written reprimands. *See* Pl.'s App. at 17. With these reasons, BE & K has met its burden of producing legitimate, nondiscriminatory reasons for Plaintiff's termination.

### 4. *Pretext.*

Because BE & K has advanced legitimate, nondiscriminatory reasons for its decision to terminate Plaintiff's employment, the burden shifts back to Plaintiff to present evidence to support a finding that the proffered reasons for her termination were pretextual. *See Ruby v. Springfield R–12 Public Sch. Dist.*, 76 F.3d 909, 911 (8th Cir.1996). As the Supreme Court explained in *Burdine*, "[a plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." 450 U.S. at 256, 101 S.Ct. 1089.

"Courts do not sit as super-personnel departments to second-guess the business decisions of employers." *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 837 (8th Cir.2002) (citing *Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998)). "The threshold question when considering pretext is whether [the employer's] reasons for its employment actions are true, not if they are wise, fair or correct." *Id.*; *see also Clay v. Hyatt Re-*

*gency Hotel,* 724 F.2d 721, 725 (8th Cir. 1984) ("While an employer's judgment may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was pretext for illegal discrimination."). Thus, at this stage of the analysis, Plaintiff must show sufficient admissible evidence from which a rational finder of fact could conclude that the BE & K's proffered nondiscriminatory reason was not the real reason for her termination and, instead, that BE & K's conduct was actually motivated by intentional discrimination. *See St. Mary's,* 509 U.S. at 515, 113 S.Ct. 2742; *Lang v. Star Herald,* 107 F.3d 1308, 1311 (8th Cir.1997). As noted, Plaintiff can meet this burden in a variety of ways, including by showing that BE & K's explanation for her termination is "unworthy of credence," *see Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."), or by showing that BE & K "meted out more lenient treatment to similarly situated employees who were not in the protected class." *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 835 (8th Cir.2002).

In the present case, Plaintiff attempts to show that BE & K's stated reasons for her termination are pretext by offering evidence that similarly situated white employees were treated more favorably than was she. "Instances of disparate treatment can support a claim of [discrimination], but [plaintiff] has the burden of proving that [s]he and the disparately treated [employees] were similarly situated in all relevant respects." *E.E.O.C. v. Kohler Co.,* 335 F.3d 766, 775–76 (8th Cir.2003) (internal quotation and citation omitted); *Rodgers,* 417 F.3d at 853. Plaintiff's burden for identifying similarly situated comparators

at the pretext phase of the analysis is "rigorous." *Wheeler,* 360 F.3d at 858. "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark,* 218 F.3d at 918 (citing *Lynn,* 160 F.3d at 487–88). Moreover, "to be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of 'comparable seriousness.' " *Rodgers,* 417 F.3d at 853 (quoting *Harvey v. Anheuser-Busch, Inc.,* 38 F.3d 968, 972 (8th Cir.1994) (other citations and quotations omitted)).

a. *Is BE & K's contention before the ICRC that Plaintiff's employment was terminated due to legitimate performance issues pretext for discrimination?* [13]

Plaintiff makes much of the fact that BE & K's counsel "indirectly argued to the Iowa Civil Rights Commission that Ms. Johnson was fired because she had accumulated 3 written reprimands." [14] Pl.'s Resistance Br. at 7. BE & K's counsel did, in fact, argue to the ICRC that Plaintiff's employment was terminated "for legitimate performance issues," Pl.'s App. at 17, but this argument is entirely consistent with BE & K's position throughout this litigation. That is, BE & K has repeatedly argued that ADM requested Plaintiff be removed from her position in ADM's warehouse due to legitimate performance issues, BE & K complied with ADM's re-

quest, and BE & K terminated Plaintiff's employment because it did not have any other positions available for her at the ADM plant. As BE & K argues in its brief:

> The material facts in this matter clearly show that Ms. Johnson was terminated because there were no available positions after ADM requested she be removed from the warehouse. ADM requested Ms. Johnson be removed from the warehouse because of excessive phone usage, the fact she was argumentative with BE & K workers and management and did not respond to constructive criticism.
>
> The personal phone usage conducted by Ms. Johnson was in clear violation of a company policy regarding the same. Ms. Johnson understood that personal phone calls were for emergency reasons only and were to be completed only during break times. Ms. Johnson was warned about this issue on various occasions, yet still gave out BE & K's number as her personal contact number and frequently spoke with her daughter at work.
>
> BE & K had legitimate business reasons for terminating Ms. Johnson's employment as there was no position available to her after ADM requested her removal from the warehouse.

BE & K's Br. at 10–11.

■■■ At this point, the Court finds it necessary to make a distinction that Plain-

---

13. BE & K has consistently maintained that its legitimate nondiscriminatory reason for Plaintiff's termination is that it had no alternate positions in the ADM plant in which to place her. Because Plaintiff is proceeding on a theory that BE & K is liable for ADM's discriminatory motivations, however, BE & K has also necessarily had to offer a legitimate nondiscriminatory reason for ADM's request that Plaintiff be removed from the ADM warehouse. Accordingly, the Court finds it pru-

dent to address Plaintiff's "legitimate performance issues," even though it is not BE & K's primary defense.

14. Plaintiff does not argue the Court should find pretext on the basis that BE & K "made substantial changes over time in its proffered reasons for [its] employment decision." *See Arnold v. Nursing & Rehab. Ctr. at Good Shepherd, LLC,* 471 F.3d 843, 847 (8th Cir.2006).

tiff consistently fails to make, that is, it must distinguish between *ADM's* reasons for requesting Plaintiff's removal from the warehouse (her phone usage, argumentativeness, and failure to respond to criticism) and *BE & K's* asserted reason for terminating Plaintiff (lack of available positions). Plaintiff spends the majority of her resistance brief attacking ADM's stated reasons for requesting she be removed from the warehouse. *See* Pl.'s Resistance Br. at 6–15. For instance, Plaintiff argues that she has "ample evidence that she was a good employee," that her "use of the telephone was not out of line," and that she "was not aggressive or disrespectful in the February 29, 2008 meeting." *Id.* The undisputed fact remains, however, that ADM did not have the decisionmaking authority to terminate Plaintiff's employment.[15] Because actions of a nondecisionmaker are normally insufficient to establish a discriminatory animus, *see Beshears,* 930 F.2d at 1354, Plaintiff's efforts to hold BE & K accountable for ADM's allegedly discriminatory conduct must be based on some alternative theory of liability. Here, Plaintiff's asserted theory of liability is essentially that ADM harbored a discriminatory animus toward Plaintiff; ADM influenced BE & K's deci-sion to terminate Plaintiff; and ADM's actions should be imputed to BE & K such that BE & K's termination decision should be deemed discriminatory. Though none of the parties mentions the theory, Plaintiff's assertions equate in substance to a contention that BE & K is responsible for ADM's discriminatory motivations under a "cat's paw" theory of liability.

■ The "cat's paw" theory of liability provides that "an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design."[16] *Qamhiyah v. Iowa State Univ. of Sci. & Tech.,* 566 F.3d 733, 742 (8th Cir.2009) (quoting *Richardson v. Sugg,* 448 F.3d 1046, 1060 (8th Cir.2006)); *see also Dedmon v. Staley,* 315 F.3d 948, 949 n. 2 (8th Cir.2003) ("[A]n employer can be liable, under certain circumstances, where the formal decisionmaker is not the person who harbored an unlawful motive to terminate the employee."). Cat's paw cases traditionally arise in situations where a person without decisionmaking authority

---

**15.** In ADM's Statement of Material Fact ¶ 5, ADM asserts that "BE & K hires, disciplines, pays, and terminates its employees. ADM does not, and cannot, discipline or discharge BE & K employees." Plaintiff denies this assertion on the basis that "BE & K disciplines and discharges at ADM's request." Pl.'s Response to ADM's Facts ¶ 5. Plaintiff's denial in this regard is little more than a legal conclusion that is unsupported by Plaintiff's proffered citations to the record. In any event, Plaintiff has not offered any evidence that would contradict ADM's assertion that it has no authority to discipline or terminate BE & K employees.

**16.** The term's derivation was explained in 2006 by the Tenth Circuit:

> The "cat's paw" doctrine derives its name from a fable, made famous by La Fontaine, in which a monkey convinces an unwitting cat to pull chestnuts from a hot fire. As the cat scoops the chestnuts from the fire one by one, burning his paw in the process, the monkey eagerly gobbles them up, leaving none left for the cat. Today the term "cat's paw" refers to "one used by another to accomplish his purposes." In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.

*EEOC v. BCI Coca–Cola Bottling Co. of Los Angeles,* 450 F.3d 476, 484 (10th Cir.2006) (citations omitted).

harbors a discriminatory animus towards an employee. If the actual decisionmaker is influenced to take an adverse employment action against the employee by the individual harboring a discriminatory animus, and defers to the opinion and judgment of that individual without question, the decisionmaker is arguably acting as little more than a conduit for that person's discriminatory motives. In this situation, the bias of the person without decisionmaking authority *may*, in the proper factual setting, be imputed to the decisionmaker, even though the decisionmaker himself harbors no discriminatory animus.[17] *Compare Dedmon,* 315 F.3d at 948 (rejecting cat's paw liability in case where county employee sought to hold county clerk liable for retaliation on the basis that employee's immediate supervisor had discriminated against her, noting that there was no evidence the supervisor "possessed any influence or leverage over [the county clerk's] decision to terminate") *and Lacks v. Ferguson Reorganized Sch. Dist. R–2,* 147 F.3d 718, 724–25 (8th Cir.1998) (finding no cat's paw liability where teacher asserted that principal and superintendent influenced the school board's termination decision where the evidence supported a conclusion that "the board made an independent determination as to whether [the teacher] should [have been] terminated and did not serve merely as a conduit for the desires of school administrators") *with Stacks v. Southwestern Bell Yellow Pages, Inc.,* 27 F.3d 1316, 1323 (8th Cir.1994) (reversing a district court grant of summary judgment in favor of an employer and against an employee who had argued that her immediate supervisor was biased

against her, stating that "an employer cannot escape responsibility for discrimination[ ] when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of women," and noting that where a supervisor is "closely involved in the decisionmaking process at each step," it was "of little consequence" that the supervisor was not the one to "pull the trigger").

■■■ The Court recognizes that the factual setting of this case presents a somewhat different picture than the traditional cat's paw scenario, namely in the fact that the "supervisor" who allegedly harbored a discriminatory animus toward Plaintiff, Tanner, was an ADM employee, not a BE & K employee. Given that ADM and BE & K are distinct corporate entities and that ADM itself had no power whatsoever to terminate Plaintiff's employment, BE & K can only conceivably be liable for alleged discriminatory conduct by ADM under some type of agency theory of liability, such as the cat's paw theory. While the Court has serious reservations as to whether this factual scenario is a proper expansion of the cat's paw theory, it will nonetheless presume for purposes of the present motion only that the theory is viable and that ADM's allegedly biased motivations for requesting that Plaintiff be removed from the warehouse can be imputed to BE & K as a motivation for BE & K's ultimate termination decision. Even with this presumption, however, Plaintiff's claims against BE & K fail because there is no evidence that ADM's stated reasons for requesting Plaintiff's removal from the warehouse were mere pretext for unlawful discrimination.

---

**17.** The Court notes that the cat's paw theory of liability is somewhat controversial, and though its use is well-established in the Eighth Circuit, its boundaries are not thoroughly defined and vary extensively from circuit to circuit. *See BCI Coca–Cola,* 450 F.3d at 486–87 (engaging in an extensive discus-

sion). Indeed, the United States Supreme Court recently granted certiorari on a Seventh Circuit cat's paw decision. *See Staub v. Proctor Hosp.,* 560 F.3d 647 (7th Cir.2009), *cert. granted* —— U.S. ——, 130 S.Ct. 2089, 176 L.Ed.2d 720 (2010).

According to Tanner's deposition, he requested that Plaintiff be removed from the warehouse "because of excessive phone usage; the fact that she was argumentative with BE & K workers, also BE & K management; and any time you tried to construct a criticism as far as job related, she would not respond." BE & K App. at 44. Plaintiff's only evidence that these complaints about her were mere pretext for discrimination are Plaintiff's own assertions that she was treated less favorably than similarly situated comparators Jamie Davis ("Davis") and Tracy.[18]

With respect to Davis, the Court finds there is insufficient evidence to deem her a similarly situated comparator. According to Plaintiff, "In 2007, ADM supervisor, Russ Steen, requested that BE & K remove warehouse employee Jamie Davis, [c]aucasian, from the warehouse because he perceived that she could not get along with other co-workers." Pl.'s Resp. to ADM's Facts ¶ 76. "BE & K removed Jamie Davis from the warehouse and transferred Ms. Davis to a position on the paint crew." *Id.* ¶ 77; *see also* Pl.'s Facts ¶ 14 ("Russ Steen had asked that BE & K employee Jamie Davis not work in the warehouse any longer so she went to the painting crew."). While Davis and Plaintiff were both accused of poor interactions with coworkers, there is no evidence in the record that Davis had problems with excessive phone usage or that Davis failed to respond to constructive criticism. *See Clark*, 218 F.3d at 918 (finding that similarly situated comparators must have "engaged in the same conduct without any mitigating or distinguishing circumstances"). Moreover, there is no evidence regarding the severity of Davis' failed interactions with coworkers. *See Rodgers*, 417 F.3d at 853 (noting that similarly situated comparators must have engaged in similar conduct of "comparable seriousness"). Finally, the supervisor that requested Davis' removal from the warehouse was Russ Steen, whereas the supervisor that requested Plaintiff's removal from the warehouse was Bill Tanner. *See Clark*, 218 F.3d at 918 (finding that similarly situated comparator must have "dealt with the same supervisor").

18. Plaintiff makes generalized assertions in support of her pretext argument that amount to little more than quibbling with the reprimands handed down against her as generally unfair or incorrect. For instance, Plaintiff points out that Russ Steen characterized her as "overall a fairly good employee," Pl.'s Resistance Br. at 8, and that lots of employees used the phone too much at ADM. *Id.* at 13. For the most part, however, Plaintiff does not deny that she committed the infractions lodged against her. Indeed, Plaintiff admits that she used the phone for personal calls in violation of the company policy on numerous occasions, but then contends that Tanner "made assumptions that Ms. Johnson was misusing the phone, based perhaps on a stereotype." *Id.* at 13. Plaintiff spends additional time pointing out that it is "important to view [her] performance, work skills and work habits in the proper context," namely that her job was a "semi-skilled position in an industrial warehouse." *Id.* at 10. Plaintiff states: "Admittedly, she probably should not have allowed her daughter to phone her at work or given a work number to creditors, but she wasn't in the running to be CEO of ADM ... her shortcomings as an employee were easily matched by her coworkers Jerry Stoddard who was lazy and [Ms.] Tracy who was argumentative and had poor attendance." *Id.* Such arguments do not properly demonstrate that BE & K's legitimate nondiscriminatory reason for her termination were mere pretext for discrimination. As noted previously, "Courts do not sit as super-personnel departments to second-guess the business decisions of employers." *Dorsey*, 278 F.3d at 837 (citations omitted). "The threshold question when considering pretext is whether [the employer's] reasons for its employment actions are true, not if they are wise, fair or correct." *Id.*

The similarly situated comparison with regard to Tracy superficially presents a closer question. Tracy is a caucasian female who, like Plaintiff, worked the ADM warehouse counter. ADM App. at 82. Tracy had problems with attendance, BE & K App. at 83–84, personal phone usage, ADM App. at 85, getting along with coworkers, *id.* at 86, and complying with supervisor instructions, BE & K App. at 85. Despite Tracy's apparent deficiencies, she remained employed in her position at the warehouse for 15 months [19] after Plaintiff's own termination, at which time Tanner requested that BE & K remove Tracy from the warehouse due to attendance problems and poor performance. ADM App. at 87 (Tanner testifying at deposition that "[Tracy] kept missing. And at that point, I talked to [BE & K]. Said I no longer want her in my department due to the fact of her attendance and poor performance."). While all of these factors certainly might have compelled ADM to have requested Tracy's removal earlier than it did, Plaintiff's burden at the pretext stage of the analysis requires her to do more than just assert that other employees were arguably more deserving of termination than was she. Rather, Plaintiff must show that a purported comparator is "similarly situated in all relevant respects." *Fields v. Shelter Mut. Ins. Co.,* 520 F.3d 859, 864 (8th Cir.2008). To that end, the record reveals several mitigating or distinguishing considerations between Plaintiff and Tracy that prohibit a finding that the two are similarly situated. For instance, there is no evidence in the record that Tracy failed to respond to constructive criticism or that she was argumentative with BE & K management. *See Warfield v. Lebanon Corr. Inst.,* 181 F.3d 723, 729 (6th Cir.1999) (finding that plaintiff could not prove pretext by showing that one coworker who committed "Act B" and another coworker who committed "Act E" were not terminated, when the plaintiff was terminated for committing "Acts A, B, C, D, and E"). Additionally, while Tracy was alleged to have instances of excessive phone usage, there is no evidence that she was giving out office phone numbers at the ADM plant as her own. Indeed, there is very little, if any, evidence in the record regarding the comparable seriousness of Plaintiff's phone usage versus that of Tracy. Moreover, ADM personnel reported that Tracy's phone usage improved after she was confronted on the matter, whereas Plaintiff's phone usage did not improve. *See* BE & K Facts ¶¶ 18–19, 35–36; ADM App. at 86–87 (Tanner discussing at deposition how Tracy's phone usage improved after she was counseled and noting that the only reasons he requested her removal from the warehouse were Tracy's attendance and her inability to get along with coworkers).

Given that Plaintiff has failed to identify an appropriate similarly situated comparator, Plaintiff's assertion that Tanner's request to have her removed from the warehouse was pretext for unlawful discrimination fails. Since Plaintiff's case

**19.** Plaintiff states repeatedly that Tracy held her position in the ADM warehouse for an additional fifteen months after Plaintiff's termination. *See* Pl.'s Resistance Br. at 7; Pl.'s Resp. to ADM's Facts ¶ 78; Pl.'s Resp. to BE & K's Facts ¶ 45. In support of this fact, Plaintiff cites her own Statement of Material Fact ¶ 55. *See* Pl.'s Resp. to BE & K's Statement of Fact ¶ 45 ("Admit Ms. Tracy was transferred out of the warehouse about 15 months after Ms. Johnson was fired. Plaintiff's Fact 55."). Plaintiff's Statement of Material Fact ¶ 55, however, merely states that "Two white employees who had been asked to leave the warehouse were placed on the painting crew." It says nothing of the duration of Tracy's employment in the warehouse. For purposes of the present discussion, however, the Court will accept the "15 months" assertion as true.

against BE & K turns on imputing Tanner's alleged bias to BE & K, this lack of evidence of pretext necessarily defeats Plaintiff's claim against BE & K as well. Even assuming, however, that Tracy is a legitimate similarly situated comparator, the fact remains that ADM's action with regard to both Tracy and Plaintiff was ultimately the same, that is, in both situations Tanner requested that BE & K remove the allegedly troubled worker from the warehouse.[20] Indeed, it is undisputed that Tanner did not request that BE & K terminate either Plaintiff or Tracy, and Plaintiff offers no evidence whatsoever that Tanner had any knowledge that alternate positions were not available in the ADM plant, or that BE & K might decide to terminate Plaintiff's employment. In short, there is a total lack of evidence that either Tanner or ADM "initiated, exercised, or even possessed any influence or leverage over [BE & K's] decision to terminate [Plaintiff]."[21][22] *Dedmon*, 315

---

**20.** An argument could be made that the requested removal was *not* the same for both Tracy and Plaintiff because Tanner did not request Tracy's removal from the warehouse for approximately fifteen months after he requested Plaintiff's removal. Such an argument is of little import, however, given the Court's conclusion that Tracy is not a similarly situated comparator in any event. More significant, however, is that fact that the record contains minimal evidence regarding Tracy's performance in the time frame after Plaintiff's termination. *See* BE & K App. at 65 (a Reprimand issued to Tracy for "refusal to obey instructions of immediate supervisor or other management about not parking at north gate" dated December 31, 2008, which is the only reprimand dated after Plaintiff's termination).

**21.** Even if Plaintiff could show that Tanner sought to compel BE & K to undertake a discriminatory employment action, Plaintiff would still be required to demonstrate that BE & K failed to "accurately a[ss]ess[ ] [Plaintiff's] situation or performed a perfunctory review and 'rubber stamped' the recommendation [for detrimental job action]" before Tanner's discriminatory motive could be imputed to BE & K under a cat's paw theory of liability. *Kramer v. Logan County Sch. Dist. No. R–1*, 157 F.3d 620, 624 (8th Cir.1998). In this regard, however, BE & K had ample information of its own that Plaintiff had engaged in conduct that would violate various company policies, which would support an independent decision by BE & K's to terminate Plaintiff's employment "for legitimate performance issues." For instance, Plaintiff gave out BE & K's office phone number to creditors, resulting in McNitt receiving "several" calls for Plaintiff on the office line, in violation of company policy. *See* ADM App.

at 115; BE & K Facts ¶¶ 12–13; ADM App. at 128 (Zuidema testifying that McNitt told him to write up Plaintiff's final reprimand before her termination because Plaintiff "was on the phone a lot and [McNitt] was getting four to six phone calls in her office a day for [Plaintiff]"); *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir.2008) ("We have consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee.") (citing *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir.2006)).

**22.** An additional problem with Plaintiff's attempt to employ a cat's paw liability theory on the facts of this case is that the adverse employment action at issue is the *termination* of Plaintiff's employment with BE & K, not her mere removal from the warehouse. Thus, even if BE & K "rubber-stamped" ADM's request to remove her from the warehouse, Plaintiff does not, and indeed cannot, assert that BE & K's action in removing Plaintiff from her position in the warehouse, in itself, constitutes an adverse employment action. *See Jones v. Reliant Energy–ARKLA*, 336 F.3d 689, 691 (8th Cir.2003) (finding that an adverse employment action is a "tangible change in working conditions that produces a material employment disadvantage"). Indeed, if BE & K had ultimately determined that Plaintiff should be transferred to an alternate position, its decision may or may not have been actionable as an adverse employment action depending on the features and benefits of the new position versus those of Plaintiff's position in the warehouse. *See, e.g., Higgins v. Gonzales*, 481 F.3d 578, 587 (8th Cir.2007) (finding no adverse employment action where employee was transferred

F.3d at 950 (noting that, as in the present case, "the evidence suggests that [the supervisor who was allegedly biased against the plaintiff] was not consulted or even aware that [the plaintiff's employer] was going to fire [her] until the time [the employer] had already made the decision").

In this case, it is undisputed that *BE & K* made the ultimate decision to terminate Plaintiff's employment, rather than to transfer her to an alternate position at the ADM plant. Indeed, Plaintiff admits that Tanner did not request that she be terminated, that BE & K alone made the decision to terminate Plaintiff, and that ADM was not consulted and had no input into BE & K's termination decision, other than to request that Plaintiff be removed from the warehouse. ADM Facts ¶¶ 81–85. On these facts, BE & K cannot be held liable for any allegedly discriminatory motive by ADM under Plaintiff's asserted theory of liability. Indeed, BE & K has proffered a legitimate nondiscriminatory reason for its decision to terminate Plaintiff, namely that there were no other positions available at the ADM plant. It is this legitimate nondiscriminatory reason that Plaintiff must overcome to defeat summary BE & K's Motion for Summary Judgment.

b. *Is BE & K's assertion that Plaintiff was terminated because there were no alternate positions available pretext for discrimination?*

■ BE & K has consistently maintained, both on Plaintiff's termination notice, *see* BE & K App. at 59, and in its pleadings, that Plaintiff's employment was terminated because there were no alternate positions in which to place her at the ADM plant. Plaintiff's attempts to demonstrate that this asserted nondiscriminatory reason is pretext for discrimination by again pointing to Davis and Tracy as similarly situated comparators that were treated more favorably. Plaintiff contends that Davis and Tracy were both "asked to leave the warehouse, were transferred out of the warehouse and were awarded positions on the paint crew. In contrast, Ms. Johnson who is African American was ushered to the door."[23] Pl.'s Resistance Br. at 5. With respect to Davis, it appears that Russ Steen, an ADM supervisor, requested that BE & K remove Davis from the warehouse because he perceived that she was not able to get along with her coworkers. In response, BE & K transferred Davis to a painting crew. *See* ADM Fact ¶¶ 76–77; ADM App. at 8 (Pl.'s Dep.: "[Davis] left the warehouse, and she went to painter—to a painting position.... To my understanding, Russ Steen has asked

to alternate position in which there was no changes to her salary, benefits, or level of responsibility); *Zhuang v. Datacard Corp.*, 414 F.3d 849, 854 (8th Cir.2005) (holding the plaintiff failed to raise a genuine issue of material fact where it was uncontested her pay and benefits remained the same after a change in job responsibilities); *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 929 (8th Cir.2004) (finding an adverse employment action where an employee was terminated from one position and offered a "sufficiently inferior" alternative position wherein her salary was the same, but her "career prospects both within and outside the company" would be diminished due to lessened responsibilities).

**23.** Plaintiff additionally asserts in her Statement of Facts that "Caucasian ADM warehouse employees Tracy VanKampen and Bridget Eyrich received counseling memos regarding personal calls on company time.... Both remain working at ADM." Pl.'s Facts ¶ 61. To the extent that Plaintiff is asserting that VanKampen and Eyrich are similarly situated comparators, the Court finds they are not. Eyrich is directly employed by ADM, whereas Plaintiff is employed by BE & K. *See* ADM App. at 82 (Tanner testifying in deposition that Eyrich was an employee of ADM). VanKampen also appears to be employed by ADM. *See ADM's* Resp. to Pl.'s Facts ¶ 61.

that—that she not work there anymore at the warehouse."); ADM App. at 155 (Tanner Decl. ¶ 23, stating that Steen requested Davis be removed from the warehouse because "she did not get along with co-workers" and stating that BE & K "transferred Jamie Davis to a position on the paint crew"). With respect to Tracy, however, Plaintiff does not offer any evidence in support of her claim that Tracy was transferred to the paint crew.[24] There is, however, evidence in the record supporting a conclusion that BE & K provided Tracy with an alternate position at ADM after Tanner requested she be removed from her position in the warehouse. *See* ADM Fact ¶ 78 ("ADM also requested that BE & K employee Tiffany Tracy, [c]aucasian, be removed from the warehouse because Mr. Tanner believed she was having increased attendance problems."); ADM App. at 155 (Tanner Decl. ¶ 24, stating: "In February 2009, I requested that BE & K employee Tiffany Tracy, [c]aucasian, be removed from the warehouse because I believed she was having increased attendance problems and the fact that she was argumentative with co-workers. BE & K transferred Tiffany Tracy out of the warehouse."). Regardless of what positions Davis and Tracy obtained at ADM after being removed from the warehouse, however, a similarity between Davis, Tracy, and Plaintiff is apparent: ADM requested that all three, for one reason or another, be removed from their positions in the ADM warehouse. The distinction, of course, is that BE & K transferred Davis and Tracy to other positions at ADM, whereas Plaintiff's employment was terminated.

As discussed, however, BE & K's legitimate non-discriminatory reason for terminating Plaintiff's employment, rather than transferring her to another position, is that it did not have any open positions in which to place Plaintiff at the time ADM requested she be removed from the warehouse. In response, Plaintiff insists that "Iowa Workforce Development records show BE & K was advertising for an opening on the paint crew at the same time it was claiming it had no positions for Ms. Johnson," and that this fact evidences that BE & K's stated reason for Plaintiff's termination is false. In support of this contention, Plaintiff proffers a job posting for "Industrial Painters," with the following job description:

> Applicant must have experience with brush, roller, and spray painting. Must be experienced in industrial coating applications. Scaffold experience helpful. Candidate must be physically able to wear a respirator and be willing to work at heights. Applicant must be able to work in a variety [of] environmental conditions, such as hot and cold temperatures and a dust environment. Must have a valid driver's licence. This position is at the ADM plant working for a local contractor in Clinton, Iowa. We offer long term employment with benefit package, including 401K, health, life, and dental insurance. This is an hourly position. Pay is based on previous experience and qualifications.

Pl.'s App. at 2–3. The notice also states under the heading "Employer Requirements": "Experience: 12 months" and contains a heading that states: "Date Taken: 03/19/2008."

Plaintiff's contention that the job posting evidences that BE & K's legitimate nondiscriminatory reason for her termination is pretext fails for several reasons. First, Plaintiff's employment with BE & K was terminated on March 3, 2008. BE & K

---

**24.** The record citations Plaintiff offers do not support her assertion that Tracy was placed on the paint crew. *See* Pl.'s Facts ¶ 55 (citing ADM Fact ¶ 78, which states only that Tracy was "removed from the warehouse").

App. at 59. Plaintiff argues that this posting "show[s] BE & K was advertising for an opening on the paint crew at the same time it was claiming it had no positions for Ms. Johnson." Pl.'s Resistance at 8. The job posting for a painter, however, is dated March 19, 2008, a date two weeks and two days after Plaintiff's termination. Plaintiff has offered no evidence of any position in the ADM plant that was available on the date that BE & K made its termination decision, nor has Plaintiff offered any evidence that would support a conclusion that BE & K had knowledge that any job vacancies at the ADM plant either existed or were likely to arise within the immediate time frame surrounding Plaintiff's termination.

Moreover, even assuming that BE & K had a position on the paint crew open at the time that Plaintiff was terminated, Plaintiff has not offered sufficient evidence that she met the qualifications for the advertised position.[25] According to Plaintiff, she "has completed vocational training and has job experience in painting and refinishing [and] was qualified for the position." Pl.'s Resistance Br. at 8. Specifically, Plaintiff states:

I have a trade certificate for completing a one-year class on furniture refinishing. The skills I learned in this class include preparing surfaces for painting or finishing, sanding, stripping of finishes, use of spray guns for applying finishes including different kinds of paint, wood stains

and lacquer. I also learned the proper use of a paint brush, paint rollers and various techniques of cleaning up equipment after painting. I also worked a temporary job after my training preparing window shutters for painting and then painting and finishing them.

Pl.'s App. at 9–10 (Pl.'s Aff. ¶ 3). Plaintiff does not explain, however, how vocational training in furniture refinishing and a temporary job painting window shutters equates to the requirements of the industrial painter position for "12 months experience" and "experience[ ] in industrial coating applications." *See id.* at 3. Since Plaintiff has offered no additional evidence that would support a finding that BE & K's asserted nondiscriminatory reason for her discharge was mere pretext for discrimination, summary judgment in favor of BE & K is warranted.

### B. *Plaintiff's Claims against ADM*

■ Since ADM is not Plaintiff's direct employer, Plaintiff's claims against ADM are that ADM aided and abetted BE & K in wrongfully terminating Plaintiff's employment. *See* Iowa Code § 216.11 (2009) ("It shall be an unfair or discriminatory practice for (1) Any person to intentionally aid, abet, compel, or coerce another person to engage in any of the practices declared unfair or discriminatory by this chapter."). However, because the Court has found no unfair or discriminatory practice by BE & K, the claim against ADM must also fail.[26]

---

**25.** By the same token, Plaintiff has not offered any evidence that BE & K does not strictly enforce previous experience requirements, or that either Davis or Tracy were unqualified for whatever positions they received at the ADM plant after ADM requested their removal from the warehouse.

**26.** The Court also notes that Plaintiff's joint resistance to both Defendants' Motions for Summary Judgment does not respond directly to any of ADM's arguments made with respect to Plaintiff's claims *against ADM*. Moreover,

as ADM aptly points out, dozens of Plaintiff's responses to ADM's Statement of Facts, as well as the majority of Plaintiff's own Statement of Facts, are improper, both in form and substance. *See* ADM's Reply Br. at 4 (listing the objectionable responses). Plaintiff's failure to properly resist ADM's Motion, standing alone, also warrants summary judgment in ADM's favor. *See* L.R. 56(b)(1) (requiring a party resisting a Motion for Summary Judgment to file a brief "in which the resisting party responds to each of the grounds asserted in the motion for summary judgment");

## IV. CONCLUSION

For the reasons stated herein, BE & K's Motion for Summary Judgment (Clerk's No. 40) and ADM's Motion for Summary Judgment (Clerk's No. 39) are GRANTED.

IT IS SO ORDERED.

56(b)(4) (requiring that Statements of Fact and responses to Statements of Fact be supported by specific references to the record).